FILED

2026 Apr-15  PM 06:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**In the United States District Court**
**For the Northern District of Alabama**
**Southern Division**

| | | |
|---|---|---|
| **United States of America** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 2:26-cr-00063-ACA-SGC** |
| | **)** | |
| **Cesar Acosta** | **)** | |

## Mr. Acosta's Response to the Government's Motion to Dismiss

Mr. Cesar Acosta, through counsel, respectfully provides the following response to the Government's motion to dismiss, Doc. 24. In its motion, the Government asks the Court to dismiss the case against Mr. Acosta without prejudice. *Id.* For the reasons set forth herein, Mr. Acosta submits that the only appropriate remedy is to dismiss the case with prejudice.

## BACKGROUND

### I.  Procedural History

Mr. Acosta is charged in a one-count indictment with intentionally and forcibly assaulting, resisting, and impeding a federal officer, specifically, Immigration and Customs Enforcement ("ICE") Supervisory Detention and Deportation Officer ("SDDO") Jared Holland, thereby causing physical contact with SDDO Holland. *See* Doc. 9. The Court held Mr. Acosta's initial appearance on a criminal complaint alleging this offense in violation of 18 U.S.C. 111(a) on February 17, 2026. *See* Doc. 1; Minute Entry 02/17/2026. The Government presented the case to a federal grand jury the next day, on February 18, 2026. The grand jury returned an indictment the following day, on February 19, 2026. Doc. 9. The Court arraigned Mr. Acosta on this

1

indictment on March 5, 2026. Minute Entry 03/05/2026. Mr. Acosta timely demanded a jury trial, and a jury trial is scheduled to begin on April 27, 2026, 70 days after his first court appearance (and just under 70 days after his indictment was filed). Doc. 18. On April 15, 2026, 12 days before trial, the Government filed the instant motion to dismiss the case without prejudice. Doc. 24. The Government's motion provides no rationale or justification for its request outside of a citation to Federal Rule of Criminal Procedure 48(a). *Id.* In a conversation with counsel, the Government has indicated that it intends to file a misdemeanor charge via information at the end of this month.

## II.   Factual Allegations

On February 16, 2026, ICE officers encountered individuals they believed to be undocumented working on a roofing project at the Snead Town Hall in Snead, Alabama. After taking several of these individuals into custody, ICE demanded that one individual on the roof (identified in this motion as "R.V.") come down to speak with them. R.V. refused. A crowd comprised of local law enforcement, ICE officers, and civilians gathered. Ultimately, the ICE officers elected to leave the area before R.V. came down from the roof.

About two hours later, local law enforcement notified ICE that they, too, would leave the area. ICE officers subsequently returned to the town hall worksite, set up surveillance, and observed R.V. alight from the roof and get into a white work van with an unnamed driver. ICE officers continued to watch as this white work van, a second white work van, and a white GMC Sierra pickup truck left the Snead worksite

heading east on U.S. Highway 278. Mr. Acosta was a passenger in one of the latter two vehicles.

Two ICE officers—SDDO Holland and Deportation Officer ("DO") William Stone—followed in separate unmarked vehicles. SDDO Holland got behind the first white van containing R.V. DO Stone followed behind the final vehicle, the GMC Sierra. About 10 miles out from Snead, SDDO Holland activated the blue lights on his unmarked truck to pull over the van containing R.V. All five of the vehicles—the two white work vans, the GMC Sierra, and the two ICE vehicles—yielded to the shoulder at the intersection of U.S. 278 and a turn-off road, Gadsden Blountsville Road.

At that point, R.V. got out of the first van and took off toward the wood line just off the highway. SDDO Holland followed on foot. DO Stone unsuccessfully attempted to cut R.V. off in his vehicle before joining the foot pursuit. While running, DO Stone allegedly saw two other individuals, one of whom was Mr. Acosta, running in the same direction, which DO Stone perceived as an attempt to "impede" the officers from getting to R.V. According to DO Stone, Mr. Acosta then engaged in a "basketball-style pick move" to slow SDDO Holland, which caused SDDO Holland to "trip and fall to the ground." Doc. 1. The two officers then took Mr. Acosta and the individual who ran with him into custody. The officers did not apprehend R.V.

a. DO Stone's Narratives of These Events

DO Stone authored and/or provided three different accounts of the foregoing incident, each of which is inconsistent with one another as to Mr. Acosta's alleged

conduct. *First*, on February 16, 2026, DO Stone wrote the affidavit supporting the federal criminal complaint against Mr. Acosta. Doc. 1. In this sworn affidavit, DO Stone averred that Mr. Acosta "made contact with SDDO Holland, in a basketball style 'pick' move to slow the officer's pursuit of the target subject, causing SDDO Holland to trip and fall to the ground." *Id.* at 5. Relying on DO Stone's sworn affidavit, the Magistrate Judge issued a warrant for Mr. Acosta's arrest. *Id.*

*Second*, on February 18, 2026, DO Stone testified before a federal grand jury to secure an indictment against Mr. Acosta. At this proceeding, when prompted to describe the events on February 16, 2026, DO Stone testified that Mr. Acosta "set what in basketball terms is a pick play where he kind of impeded SDDO Holland, which caused SDDO Holland to fall." DO Stone made no mention of physical contact between Mr. Acosta and SDDO Holland. Later during that proceeding, the Assistant U.S. Attorney ("AUSA") asked DO Stone: "Based on what you observed, did it appear as if [Mr. Acosta] intentionally got in Deportation Officer Holland's way and intentionally made contact with him?" To this compound question, DO Stone responded, "Yes, sir." Toward the end of the proceeding, the grand jury foreperson asked DO Stone: "When you said that Mr. Acosta – I know you said two gentlemen impeded you. But specifically, can you describe in detail exactly what Mr. Acosta did to impede?" DO Stone responded: "He was running in the same direction as our target subject, which was Mr. Rojelio, and he ran in front of SDDO Holland to prevent him from getting to Rojelio." Again, DO Stone made no mention of any physical contact or collision between Mr. Acosta and SDDO Holland. The AUSA then asked: "And did

4

Officer Holland run into him, trip, and fall to the ground?" Again, to this compound question, DO Stone responded: "He did."

*Third* and finally, on or about February 24, 2026,[1] about a week after the incident, DO Stone authored a DHS Form I-831 report that summarized the events leading to Mr. Acosta's arrest. In this report, all DO Stone wrote about Mr. Acosta's purportedly criminal conduct was: "While one ICE Gadsden Officer was pursuing [R.V.] on foot, GOMEZ and ACOSTA exited their vehicle and ran in front of the pursing [*sic*] ICE Gadsden officer causing the ICE officer to stumble. This delayed the pursuit, which allowed [R.V.] to evade custody." Nowhere in this report did DO Stone write that Mr. Acosta collided or otherwise made physical contact with SDDO Holland; rather, DO Stone reported that Mr. Acosta and another individual had simply "r[u]n in front" of SDDO Holland, causing SDDO Holland to "stumble."

      b.  <u>SDDO Holland's Interview with the Government</u>

On April 9, 2026, the AUSA contacted the undersigned to disclose that the AUSA had interviewed SDDO Holland that day. The AUSA disclosed that SDDO Holland had relayed that SDDO Holland had seen Mr. Acosta running alongside him during the foot pursuit, that SDDO Holland had yelled "get away" at Mr. Acosta, that SDDO Holland then "pushed" Mr. Acosta (not the other way around), and that it was this push that caused both SDDO Holland and Mr. Acosta to fall.

On April 10, 2026, at the undersigned's request pursuant to *Brady* and *Giglio*, the AUSA provided in writing a more fulsome summary of the Government's

---

[1] The first page of DO Stone's written report is dated February 16, 2026, but the pages containing DO Stone's narrative are dated February 24, 2026.

interview with SDDO Holland. In the AUSA's email, the Government relayed the following: SDDO Holland saw Mr. Acosta running within arm's length of SDDO Holland while SDDO Holland was chasing R.V. SDDO Holland yelled "get away" and then tried to push Mr. Acosta with his right arm because Mr. Acosta apparently "would have run into him" otherwise. This led SDDO Holland and Mr. Acosta to "trip, stumble, and go to the ground," and SDDO Holland allegedly "suffered a hip injury, a torn hip labrum." To date, to counsel's knowledge, SDDO Holland has not memorialized any of the above-described events or narrative in any kind of report, testimony, or similar.[2]

## ARGUMENT

The Court must dismiss the case against Mr. Acosta with prejudice for several reasons. *First*, dismissal without prejudice would permit the Government to refile charges stemming from the same set of facts while almost certainly violating Mr. Acosta's rights under the Speedy Trial Act. *Second* and relatedly, dismissal without prejudice would violate the requirements of Rule 48(a) of the Federal Rules of Criminal Procedure. Critically, Mr. Acosta would be prejudiced in the exercise of his constitutional rights, by his continued pretrial incarceration, and by his prolonged concern and anxiety in the absence of closure in this case. *Cf. Doggett v. United States*, 505 U.S. 647, 654 (1992) (quoting *Barker v. Wingo*, 407 U.S. 514, 532 (1972)). If the Court gives the Government an opportunity to refile charges against Mr. Acosta, the

---

[2] Defense counsel does not know whether any Government attorney interviewed SDDO Holland at any time prior to April 9, 2026. With all respect to Government counsel, the identification and production of all discoverable evidence or information is the responsibility of the U.S. Attorney's Office. *See generally Kyles v. Whitley*, 514 U.S. 419 (1995).

Court will effectively give the Government cover to wipe the slate clean and try again with information law enforcement had in its possession from the very start.

## I.      Mr. Acosta's Speedy Trial Act Rights

The Speedy Trial Act requires that the trial of a criminal defendant charged in an information or indictment commence within 70 days "from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1); *see United States v. Hernandez*, 724 F.2d 904, 905 (11th Cir. 1984). Neither the filing of a superseding indictment nor the dismissal of an original indictment followed by the filing of a new charge resets this clock. *United States v. Young*, 528 F.3d 1294, 1296 (11th Cir. 2008). "Thus, if the government indicts a defendant for a particular crime, dismisses that charge, and indicts the defendant once again for the same offense, the speedy-trial calculation begins with the *initial* indictment or arraignment but excludes the time between the dismissal and subsequent re-indictment." *Id.* at 1295–96 (emphasis in original). To interpret the Act otherwise would allow the Government to "reset the speedy-trial clock at will and effectively circumvent the speedy trial guarantee through the simple expedient of obtaining superseding indictments with minor corrections." *Id.* (internal punctuation marks omitted) (quoting *United States v. Bermea*, 30 F.3d 1539, 1567 (5th Cir. 1994)).

The Act also provides severe sanctions for violations of these rules. "If a defendant is not brought to trial within the time limit required by section 3161(c) as

extended by section 3161(h), the information or indictment *shall be dismissed* on motion of the defendant." 18 U.S.C. § 3162(a)(2) (emphasis added); *see Young*, 528 F.3d at 1295. In these circumstances, the Court has the discretion to decide whether to dismiss with or without prejudice. *Id.* In reaching this decision, "the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." *Id.*

Because Mr. Acosta's indictment was filed and made public on February 19, 2026, *see* Doc. 9, two days after his first appearance before the Court, the Speedy Trial Act dictates that his trial occur by April 30, 2026. *See* 18 U.S.C. § 3161(c)(1); *Hernandez*, 724 F.2d at 905. In recognition of Mr. Acosta's rights under this Act, the Court scheduled his jury trial to begin on the Monday of the week of April 30. Doc. 18. *See also* Doc. 16 (placing Mr. Acosta's case on the Monday, April 27, 2026, Trial Docket). If the Government is given leave to dismiss this case without prejudice, the Court would allow the Government to exclude time from the Speedy Trial Act between the date of the dismissal of the original indictment and the date of the filing of the new charging document for no justifiable reason. *See Young*, 528 F.3d at 1296. The alternative would be to violate Mr. Acosta's Speedy Trial Act rights. The Court should not permit the Government to circumvent Mr. Acosta's rights in this manner and should dismiss this case with prejudice.

## II.    The Government's Obligations under Rule 48(a)

Rule 48 of the Federal Rules of Criminal Procedure allows the Government (with leave of the Court) or the Court itself to dismiss an indictment, information, or complaint under certain circumstances. FED. R. CRIM. P. 48. Although the Government "is entitled to a presumption of good-faith" when seeking the dismissal of an indictment under Rule 48(a), that presumption—and the Government's discretion—is not without limits. *United States v. Dyal*, 868 F.2d 424, 428 (11th Cir. 1989). When the Government "fail[s] to state its reasons for dismissal contemporaneously with a Rule 48(a) motion," then the defendant is entitled to dismissal with prejudice if,

> in response to the government's motion to dismiss the original prosecution or via his own motion to dismiss a subsequent indictment, complaint or information, the defendant demonstrates (1) that the initial dismissal was in bad faith, or (2) that the defendant 'has been prejudiced in his ability to attack the prosecutor's motives due to the trial court's failure to require submission of adequate reasons' as a condition of dismissal of the prior prosecution.

*Id.* (citing *United States v. Welborn*, 849 F.2d 980, 984 (5th Cir. 1988)); *see United States v. B.G.G.*, 53 F.4th 1353, 1361–62 (11th Cir. 2022); *United States v. Salinas*, 693 F.2d 348, 352 (5th Cir. 1982). "A defendant can establish bad faith if 'the record affirmatively suggests' that the government sought the dismissal 'in order to achieve a tactical advantage in derogation of the defendant's rights or for the purpose of harassment.'" *B.G.G.*, 53 F.4th at 1362.

In this case, the Government has not supplied any reasons for dismissal in its motion, Doc. 24, and Mr. Acosta believes that the Government's request is not in good faith. The Government's own lead witness—the alleged victim—has directly

9

contradicted the testimony of its case agent who (1) provided a sworn affidavit to a Magistrate Judge in order to obtain a criminal complaint and (2) testified under oath before the grand jury in order to obtain the pending indictment. The Government obtained the lead witness's version of events, heretofore memorialized solely in the Government's notes, nearly two months later, and less than three weeks before the jury trial in this matter. This witness's version of events plainly does not meet the elements of the charge under 18 U.S.C. § 111(a), which is likely one reason the Government now moves to dismiss the indictment.[3] Additionally, that the Government's theory of the case keeps evolving, especially so close to trial, hamstrings Mr. Acosta's ability to adequately defend himself. It also gives the Government a tactical advantage of a surprise theory of the case that it was delinquent in investigating and, thus, disclosing to the defense. At this point, Mr. Acosta is in the unenviable position of asserting his Speedy Trial right while defending against a new theory disclosed so close to trial—a theory the Government could have and should have discerned pre-indictment.

Perhaps the officers' narratives will continue to evolve. Regardless, these are the only law-enforcement witnesses who were present during the relevant event; there is no new investigation or evidence that the Government requires. If there were,

---

[3] In relevant part, the statute provides that whoever "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . . shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both." 18 U.S.C. § 111(a). The indictment against Mr. Acosta charges that he committed the acts in § 111(a) and that those acts caused physical contact. Doc. 9.

the appropriate time to have conducted that investigation and obtained that evidence was pre-indictment.

Significantly, and as articulated above, allowing the Government to dismiss the case without prejudice and later pursue a misdemeanor predicated on the same incident would permit the Government to circumvent the Speedy Trial Act and prejudice Mr. Acosta. Mr. Acosta timely notified for trial on March 31, 2026. Three days later, the Court entered the order scheduling the trial to begin on April 27, 2026. Doc. 18. All the while, Mr. Acosta has sat in custody.[4] Allowing the Government to file charges in the future would just punt to the future an inevitable Speedy Trial Act violation. *See* 18 U.S.C. § 3161(c)(1). In other words, by dismissing without prejudice, this Court would sanction the Government's temporary, tactical dismissal.

## CONCLUSION

In light of the Government's failure to state reasons for dismissal and Mr. Acosta's assertion that the request for dismissal without prejudice is not made in good faith, Mr. Acosta asks that the Court dismiss this case <u>with prejudice</u>.

Respectfully submitted,

KEVIN L. BUTLER
Federal Public Defender
Northern District of Alabama

---

[4] The Government requested detention at Mr. Acosta's first court appearance on February 17, 2026, and the Court scheduled a detention hearing on February 23, 2026. Doc. 4; Minute Entry 02/17/2026. Between those dates, counsel learned that a Florida state court had issued an extraditable probation-violation warrant based on the levying of the instant federal case. At the advice of counsel, Mr. Acosta subsequently waived his right to a detention hearing, as release on a bond in this case would have resulted in Mr. Acosta entering Florida custody, and then likely returning to federal custody on a writ. If he is released now to the Florida warrant, he may very well sit in state custody only to be borrowed on a writ upon the eventual filing of a new charge in this Court, and the time he sits in state custody *may* be excluded under the Speedy Trial Act as time Mr. Acosta is "unavailable." *See* 18 U.S.C. § 3161(h)(3).

**/s/ Mia Gettenberg**
MIA GETTENBERG
Assistant Federal Public Defender
Mia_Gettenberg@fd.org

**/s/Kate Bounds**
KATE BOUNDS
Assistant Federal Public Defender
Kate_Bounds@fd.org

**/s/Holly Travis**
HOLLY TRAVIS
Assistant Federal Public Defender
Holly_Travis@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2026, I electronically filed the foregoing via this Court's CM/ECF system.

Respectfully submitted,

**/s/ Mia Gettenberg**
MIA GETTENBERG
Assistant Federal Public Defender

12